| | | |
|---|---|---|
| **YVONNE HILBERT,** | : | **Civil No. 1:15-cv-0471** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE LINCOLN NATIONAL LIFE** | : | |
| **INSURANCE COMPANY,** | : | |
| | : | |
| **Defendant.** | : | **Judge Sylvia H. Rambo** |

# M E M O R A N D U M

In this action arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), both sides have moved for summary judgment relating to Defendant's denial of Plaintiff's claim for long-term disability benefits. The primary issue before the court is whether the plan administrator abused its discretion in denying Plaintiff's claim. The cross motions have been fully briefed, and, for the reasons discussed below, the court will grant Defendant's motion for summary judgment and deny Plaintiff's motion.

## I.     Factual Background

The following facts come alternatively from the parties' statements of material facts accompanying their summary judgment motions and from the Administrative Record ("AR"), which the parties jointly submitted to the court. While the parties do raise some disputes and denials to their opponent's statement of material facts, all of those disputes and denials pertain to the weight that should

be given to certain evidence, the correct interpretation of evidence, or the justifiability of certain decisions made by Lincoln. There does not appear to be any dispute as to the actual facts underlying this case and therefore, the court considers those facts to be undisputed. They can be summarized as follows.

Plaintiff Yvonne Hilbert ("Plaintiff") began working as a customer service representative for Delta Dental on July 1, 2011. The position required, *inter alia*, the ability to sit for up to six hours of an eight hour day and to lift up to ten pounds occasionally.

While employed by Delta Dental, Plaintiff was a participant in an employee welfare benefit plan (the "Plan"), which included both short-term disability ("STD") and long-term disability ("LTD") coverage. The Plan was funded, in part, by a Group Insurance Policy providing STD benefits, policy number 000010106767 (the "STD Policy"), and by a Group Insurance Policy providing LTD benefits, policy number 000010106766 (the "LTD Policy"). Defendant The Lincoln National Life Insurance Company ("Lincoln") issued both policies to Delta Dental. Plaintiff's effective date of coverage under both policies was November 1, 2011.

Relevantly, the LTD Policy states that Lincoln will pay disability benefits to an insured employee after the completion of the Elimination Period, if he or she: "(1) is Totally Disabled; (2) becomes Disabled while insured for this benefit; (3) is

2

under the Regular Care of a Physician; and (4) at his or her own expense, submits proof of continued Total Disability and Physician's care to the Company upon request." (AR at 88.) The Elimination Period is defined as "180 calendar days of Total Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 360 calendar day period." (*Id.*) Totally Disabled means "[d]uring the Elimination Period and Own Occupation Period, . . . that due to an Injury or Sickness the Insured Employee is unable to perform all of the Main Duties of his or her Own Occupation." (*Id.* at 76.) "After the Own Occupation Period, [Totally Disabled] means that due to an Injury or Sickness the Insured Employee is unable to perform all of the Main Duties of any occupation for which his or her training, education, experience of physical or mental capacity will reasonably allow." (*Id.*) "Own Occupation" is defined as "the occupation, trade or profession . . . in which the Insured Employee was employed with the Employer prior to the Disability. . . . It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles." (*Id.* at 73.) "Main Duties" are "those job tasks that . . . are normally required to perform the Insured Employee's Own Occupation; and . . . could not reasonably be modified or omitted." (*Id.* at 72.)

Plaintiff stopped working at Delta Dental on September 18, 2012, and on September 25, 2012, she filed a STD claim under the STD Policy stating that a

"[c]ombination of back and leg pain and depression [made her] unable to function." (*Id.* at 1377.) Lincoln approved Plaintiff's STD claim based on a September 28, 2012 Attending Physician Statement in which Plaintiff's treating psychiatrist, Dr. Jagadeesh Moola, reported that Plaintiff was unable to work due to severe depression, as well as Plaintiff's participation in an intensive Acute Care Partial Hospitalization/Intensive Outpatient Program for depression in October 2012. Lincoln paid Plaintiff the maximum duration of benefits available under the STD Policy through March 19, 2013.

After the expiration of Plaintiff's STD benefits, Lincoln began evaluating whether she would be eligible for long-term benefits under the LTD Policy. Unlike the STD Policy, the LTD Policy contains a pre-existing condition provision under which coverage will not be provided for any disability resulting from a pre-existing condition, meaning "a Sickness or Injury for which the Insured Employee received medical advice or treatment within 3 months prior to the Insured Employee's Effective Date." (*Id.* at 95.) Thus, pursuant to this provision, Plaintiff would not be eligible for LTD benefits if she received treatment for the disabling condition during the three months prior to her effective date of coverage, *i.e.*, between August 1, 2011 and November 1, 2011 (the "Look Back Period").

A LTD benefit specialist with Lincoln, Sarah Ricker ("Ms. Ricker"), requested Plaintiff's medical records and determined that Plaintiff had received

treatment for depression during the Look Back Period. After this determination was confirmed by two nurses and a board certified psychiatrist, Lincoln concluded that Plaintiff's depression was a pre-existing condition for which Plaintiff would not be eligible for LTD coverage. As such, to be eligible for LTD benefits, Plaintiff had to show that she was independently totally disabled as of September 18, 2012 due to a condition other than depression. Because Plaintiff had indicated in her initial claim for STD coverage that her disability stemmed not only from depression but also from back and leg pain, Ms. Ricker requested updated medical records from PRISM, a clinic focused on physical medicine and rehabilitation, where Plaintiff treated with Physician Assistant Jennifer Tanner and Dr. Michael Lupinacci, in order to assess whether Plaintiff was independently totally disabled due to her back and leg pain. These records may be summarized, in pertinent part, as follows.

During a March 1, 2012 physical examination, Ms. Tanner observed that Plaintiff's knees were "doing very good," that she had full strength in her lower extremities "with good range of motion of her back, and that she "was sitting comfortably in the exam chair in no acute distress." (*Id.* at 466.) Ms. Tanner encouraged Plaintiff to exercise and stretch on a daily basis. At a March 22, 2012 pain management appointment, Ms. Tanner similarly noted that Plaintiff was "sitting comfortably in the exam chair with no acute distress," and had a "good

range of motion of her back" with full strength of lower extremities. (*Id.* at 465.) At a June 11, 2012 appointment with Ms. Tanner, Plaintiff reported that "her knee and low back pain are being managed well with her current regime," but that she "has pain with forward flexion of her back, as well as with extension, which produce radicular symptoms down her legs." (*Id.* at 464.) On examination, Ms. Tanner noted that Plaintiff maintained full strength in her extremities. (*Id.*) Following a physical examination on September 13, 2012—four days before Plaintiff stopped working—Ms. Tanner noted that Plaintiff experienced "tenderness over the lumbrosacral paraspinal muscles . . . and pain with extension to about 10 degrees," as well "impressions of "[b]ilateral degenerative joint disease" and "degenerative disc disease." (*Id.* at 956.) However, Ms. Tanner also noted that Plaintiff had a non-antalgic gait and full strength in her extremities, and "encouraged [Plaintiff] to continue exercising and stretching." (*Id.*) Ms. Tanner did not indicate any need for work restrictions. During a December 13, 2012 physical examination, Ms. Tanner noted that Plaintiff had "5/5 strength throughout lower extremities" and "has shown improvement and overall functional mobility and quality of life with her medications. Depression is what has been a big issue for her now." (*Id.* at 1322.) On January 14, 2013, Plaintiff reported to Ms. Tanner that, due to back and leg pain, "[s]he cannot stand for any period of time or walk for any period of time." (*Id.* at 1285.) On examination, Plaintiff had a "non-antalgic gait"

and "good strength throughout her upper and lower limbs." (*Id.*) Ms. Tanner noted that Plaintiff's "mental health has been a major problem" which "is certainly . . . part of her increased pain level and also decreased motivation." (*Id.* at 1286.)

Also included in Plaintiff's medical file were records from office visits with her primary care physician, Dr. Rowehl. These records reflect that Dr. Rowehl consistently performed physical examinations and noted Plaintiff's reports of pain. (*See, e.g.*, *id.* at 1155 (9/23/11 – abdominal pain), 1169 (7/27/11 – hip and abdominal pain), 430 (2/16/12 – back and leg pain), 412 (6/5/12 – eye pain).) Notably, Plaintiff saw Dr. Rowehl on September 17, 2012—the day she stopped working—for complaints of foot pain. Following a physical examination, Dr. Rowehl's general impression was tendinitis of the Achilles tendon. There is no indication in the record that Plaintiff reported back or leg pain. Similarly, during visits with Dr. Rowehl on November 1, 2012 and February 15, 2013 for diabetes and depression, Plaintiff did not report back or leg pain.

Based on these records, it appeared to Ms. Ricker that Plaintiff's physical examinations were normal, that her pain was stable and manageable, and that she was encouraged to remain active. Ms. Ricker determined that Plaintiff's depression was her disabling condition.

Nonetheless, Ms. Ricker asked Nurse Disability Consultant Judy Jacobsen, R.N. ("Nurse Jacobsen") to review the medical information and

comment on Plaintiff's functionality. Included in this information was a December 12, 2012 Attending Physician's Statement signed by Ms. Tanner stating that Plaintiff was unable to work as of September 17, 2012 because she could not "stand, walk for extended period of time" or lift more than ten pounds. (*Id.* at 1326.) Ms. Tanner indicated that Plaintiff's condition had "regressed" and it was "unknown" when Plaintiff would be able to return to work. (*Id.*) However, also included in Plaintiff's file was a November 19, 2012 work capacity form that Ms. Tanner completed for the Department of Welfare, stating that Plaintiff was temporarily disabled due to degenerative joint disease and back pain from November 31, 2012 to October 31, 2013. After reviewing Plaintiff's claim file in its totality, Nurse Jacobsen concluded that there was no medical evidence of impairment due to back, knee or shoulder pain from September 18, 2012 through January 13, 2013. As of January 13, 2013, however, Plaintiff had limitations relating to right shoulder pain lasting through October 2013 when she had surgery to repair a torn tendon. Because Plaintiff had not shown that she was totally disabled as of September 18, 2012 due to a physical condition independent of her depression, Nurse Jacobsen agreed that Plaintiff was not eligible for LTD benefits.

On November 19, 2013, Plaintiff sent Ms. Ricker a letter she received from the Social Security Administration ("SSA") stating in part that, beginning March 2013, Plaintiff was receiving $396.00 per month in Social Security

Disability benefits ("SSDI"). (AR 933.) The letter did not indicate what condition(s) the SSA found disabling or the date on which the SSA found Plaintiff to be disabled. (*See id.*)

By letter dated November 26, 2013, Ms. Ricker notified Plaintiff that she was not entitled to LTD benefits. In the letter, Ms. Ricker stated that "the medical documentation contained in your claim file indicates your depression condition is pre-existing and no benefits are payable for this condition." (*Id.* at 930.) Addressing Plaintiff's leg, shoulder and back pain, Ms. Ricker explained that, although her shoulder condition became impairing in January 2013, Plaintiff did not qualify for benefits because coverage under the LTD Policy had terminated on September 18, 2012 when Plaintiff was no longer actively at work and was not totally disabled under the LTD Policy. Ms. Ricker stated that Plaintiff could appeal the determination by submitting a letter with "[m]edical records to support [the] appeal such as office and treatment notes, laboratory results, x-rays and testing results." (*Id.* at 930.)

On April 15, 2014, Plaintiff, represented by Attorney Michael Grabhorn, timely appealed Lincoln's denial of LTD benefits. In the letter, Mr. Grabhorn did not challenge Lincoln's determination that Plaintiff received treatment for depression during the Look Back Period. Instead, he argued that Plaintiff was indeed physically unable to return to work as of September 18, 2012, and pointed

to Lincoln's prior approval of Plaintiff's STD benefits based on "Dr. Tanner's objective findings that [Plaintiff]'s degenerative disc disease and facet anthropathy precluded her from performing the duties of her own occupation." (*Id.* at 572.) In support of his appeal, Mr. Grabhorn submitted 717 pages of Plaintiff's medical records and portions of her social security file.

Appeals Specialist Lisa Kurtz, a Lincoln employee with no prior role in Plaintiff's claim, referred Plaintiff's file to Disability Nurse Consultant Virginia Rush ("Nurse Rush"), who, like Nurse Jacobsen, found no evidence of impairment from Sept 18, 2012 until Plaintiff's rotator cuff surgery in October 2013. Nurse Rush based her opinion on Plaintiff's "unremarkable" lumbar spine x-rays and her consistently normal physical examinations, as well as a physical abilities report completed by Dr. Christine Daecher, DO in connection with Plaintiff's application for SSDI, indicating that Plaintiff had a sedentary work capacity. (*Id.* 533-38). Specifically, Dr. Daecher stated that Plaintiff could lift and carry up to twenty pounds occasionally; sit for up to three hours at a time for a total of eight hours over an eight-hour workday; stand for up to two hours, and walk for up to one hour over an eight-hour workday. (*Id.*) Dr. Daecher noted that Plaintiff was "most limited by her obesity." (*Id.* at 536.) Relying on Nurse Rush's opinion, Ms. Kurtz upheld the initial decision that Plaintiff failed to prove she was totally disabled due

to any physical condition from September 18, 2012 forward, commenting as follows:

> Based on the information in the file, we find that the medical documentation does not support that there are restrictions and limitations that would render [Plaintiff] unable to perform her own occupation beyond the date last worked based upon any physical condition. She managed her back pain with medications and a TENS unit. X-rays of the lumbar spine were unremarkable. The abilities form indicates sedentary capacity. [Plaintiff] did not have complaints regarding shoulder injury until January 2013, well after the date in which she ceased working. As noted previously[,] depression was determined to be a pre-existing condition and benefits are not payable based upon this condition. We therefore find that [Plaintiff] was not Totally Disabled under the terms of our policy as of September 17, 2012.

(*Id.*at 3.) In a letter dated May 28, 2014, Ms. Kurtz notified Mr. Grabhorn that the initial determination was correct. She advised that Plaintiff could take a second appeal and should include "all medical records and supporting documentation that you or your client would like to have considered for the final review." (*Id.*at 183.)

Plaintiff's second appeal largely mirrored her first appeal, but in it she also argued that her occupation should be classified as light duty rather than sedentary. It appeared to Lincoln that the basis for her assertion was a note made by Ms. Zahn in connection with Plaintiff's STD claim indicating that Plaintiff's occupation as a customer service representative was "light." (*Id.* at 1230.) Plaintiff argues that this notation was made following an occupational analysis performed by Lincoln (*see* Doc. 66, p. 10 of 27), though Lincoln contends that no such

analysis was performed in the course of determining Plaintiff's eligibility for STD benefits since her claim was approved solely on the basis of depression and, as such, the physical demands of her occupation were irrelevant (Doc. 61, p. 11 of 28). When her claim transitioned for consideration under the LTD Policy, Ms. Ricker emailed Delta Dental on March 6, 2013 asking for a copy of Plaintiff's job description, and then referred the job description to a Lincoln vocational consultant who determined that Plaintiff's occupation as a customer service representative was sedentary. Later, and in response to Plaintiff's second appeal, Disability Appeals Specialist Joseph Jackson ("Mr. Jackson"), a Lincoln employee with no prior role in Plaintiff's claim, referred Plaintiff's vocational information, including her job description from Delta Dental, to Diane Rowe, who performed an occupational analysis on June 14, 2014, and identified Plaintiff's occupation as sedentary under standards determined by the United States Department of Labor. Mr. Jackson then referred the file to an independent medical vendor, University Disability Consortium ("UDC"), to have them obtain a physiatrist to review all the medical information and answer specific questions about Plaintiff's condition and functionality. UDC selected Robert Marks, a board certified neurologist and physiatrist.

In his July 10, 2014 report, which included a summary of the medical evidence in the file, Dr. Marks concluded that Plaintiff had a sedentary work

capacity from September 18, 2012 forward. He pointed to Plaintiff's normal physical examinations, her "very mild" lumbar spine x-ray findings, and her ability to remain active. In the report, he noted a physical abilities and limitations form completed by Ms. Tanner on March 4, 2014, which listed Plaintiff's restrictions as:

> Sitting 2 hours in an 8 hour workday (total w/o interruption 30 min) . . . All activity 2 hours in an 8 hour workday (15 min at a time) . . . No lifting above 20 lb. Bed rest during a normal workday was needed for approx.. 1-2 hour rest period. Typing, writing, and grasping small objects occas.

(AR 140.) Dr. Marks indicated that, while he mostly agreed with the restrictions and limitations outlined by Ms. Tanner, he felt "that longer sitting periods would be possible if [Plaintiff] took periodic pauses and changes in posture or position." (*Id.*) He also noted that he attempted to contact Dr. Lupinacci, the physician who worked with Ms. Tanner, on three occasions but his calls went unreturned.

Based on the totality of the information, Mr. Jackson concluded that Plaintiff failed to meet her burden of proving that she was independently totally disabled as of September 18, 2012 due to a physical condition. Once again, Plaintiff's appeal was denied.

## II.    <u>Procedural History</u>

Following the denial of her administrative appeals, Plaintiff commenced the instant action by filing a complaint on August 11, 2014 in the Western District of Kentucky, challenging the denial of her LTD benefits. (Doc. 1.) Defendant filed

an answer with affirmative defenses on September 25, 2014. (Doc. 7.) Approximately six months later, on March 9, 2015, upon a motion by Lincoln for a more convenient venue, the district court for the Western District of Kentucky transferred this action to the Middle District of Pennsylvania. (Doc. 17.) On May 1, 2015, Defendant filed a motion for judgment on the pleadings, seeking dismissal of Plaintiff's breach of fiduciary duty and disgorgement claims. (Doc. 31.) The court granted the motion in its entirety on December 8, 2015. (Docs. 48 & 49.) On August 12, 2016, the parties filed the instant cross-motions for summary judgment, along with supportive filings. (Docs. 55-66.)

In her motion for summary judgment, Plaintiff argues, *inter alia*, that Lincoln's claims determinations were arbitrary and capricious principally because Lincoln's award of STD benefits cannot be reconciled with its subsequent denial of LTD benefits. In addition, Plaintiff argues that her position should be classified as light duty, rather than sedentary, and that Lincoln ignored relevant medical evidence, particularly Ms. Tanner's finding that Plaintiff was disabled due to leg and back pain as of September 17, 2012, as well as the SSA's finding that Plaintiff is disabled from any occupation.

In its cross-motion for summary judgment, Lincoln argues that its denial of Plaintiff's claim was not an abuse of discretion as the decision was based on Plaintiff's contemporaneous medical records, which reflected normal

examinations, and the reports of two nurses and two medical doctors concluding that Plaintiff was not prevented from performing her occupation, which was sedentary. Lincoln further argues that it did not abuse its discretion by not deferring to the SSA's decision because the information provided by Plaintiff related to the SSA's award of benefits was incomplete.

After an overview of the relevant parts of the Plan and its long-term disability eligibility requirements, as they relate to this dispute, the court will address the arguments presented by both parties.

## III.    Standards of Review

### A. Summary Judgment

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Melrose Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are those that will affect the outcome of the trial under governing law. *Id.* The court's role in considering motions for summary judgment is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving

party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, '[the] court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the opposing party "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

## B. ERISA Standard of Review

In a case seeking benefits under a plan governed by ERISA, although summary judgment rules control, the court "sits more as an appellate tribunal than

as a trial court." *Gibson v. Hartford Life & Acc. Ins. Co.*, 2007 WL 1892486, *5 (E.D. Pa. June 29, 2007) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002)). "The [c]ourt's review is undertaken by examining 'the record as a whole,' meaning the 'evidence that was before the administrator'" at the time the decision was made. *Id.* (quoting *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997)).

When the terms of an ERISA plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the administrator's decision is granted considerable deference and will be overturned only where there is an abuse of discretion. *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Here, as this court has previously determined, because the Plan grants Lincoln the authority to determine eligibility and resolve claims questions (*see* AR at 81), the abuse of discretion standard applies, *see Hilbert v. Lincoln Nat'l Life Ins. Co.*, Civ. No. 1:15-cv-0471, 2016 WL 727584, *1 (M.D. Pa. Feb. 24, 2016). Accordingly, the court will not disturb Lincoln's benefits determination unless it is "arbitrary and capricious." *See Metro. Life. Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).

Under the arbitrary and capricious standard, a "court may overturn a decision of the Plan administrator only if it is without reason, unsupported by the

evidence or erroneous as a matter of law." *Cottillion v. United Ref. Co.*, 781 F.3d 47, 55 (3d Cir. 2015). This scope of review is narrow and thus the court is not free to substitute its own judgment for that of the plan administrator as if it was considering the issue of eligibility in the first instance. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 439 (3d Cir. 1997). The plaintiff has the burden of proving that the administrator's decision to deny benefits was arbitrary and capricious. *Id.*

IV. **Discussion**

After a thorough review of the record in this case, the court finds that Lincoln's determination that Plaintiff was not eligible for LTD benefits under the Plan was not arbitrary and capricious. The record demonstrates that Lincoln considered the relevant medical evidence and supports Lincoln's decision that Plaintiff was not totally disabled due a physical condition as of September 18, 2012. Thus, as explained below, the court will uphold Lincoln's denial of Plaintiff's claim for LTD benefits.

**A. Lincoln's approval of Plaintiff's STD claim**

In her motion for summary judgment, Plaintiff repeatedly argues that Lincoln's approval of her STD claim cannot be reconciled with its denial of her LTD claim. (*See, e.g.*, Doc. 59, pp. 22-23 ("Lincoln abruptly changed its position when [Plaintiff] became eligible for LTD benefits.").) However, Plaintiff's STD and LTD claims are governed by separate insurance policies, and the difference in

the outcomes of those claims is explained by the presence of the pre-existing condition provision contained in the LTD Policy and absent from the STD Policy. The very same disabling condition that made Plaintiff eligible for coverage under the STD Policy—depression—made her ineligible for coverage under the LTD Policy because she had sought treatment for the condition in the three-month period prior to her effective date of coverage, thus rendering it pre-existing. As such, Plaintiff was ineligible for LTD benefits unless she could prove that she was entitled to coverage due to an independent disabling condition, which she failed to do. Under these circumstances, Lincoln's approval of Plaintiff's STD claim in no way undermines Lincoln's subsequent denial of her LTD claim. *See Pini v. First Unum Life Ins. Co.*, 981 F. Supp 2d 386, 413-14 (W.D. Pa. 2013) (rejecting plaintiff's argument that denial of LTD benefits was an abuse of discretion because STD benefits had been previously awarded).

### B. Lincoln's classification of Plaintiff's job duties as "sedentary"

Plaintiff further argues that Lincoln's classification of her occupation as a customer service representative at Delta Dental as sedentary, rather than light duty, was arbitrary and capricious. In this regard, Plaintiff relies on a notation in her STD file identifying her occupation as light duty, as well as Delta Dental's job description which includes at least one job requirement consistent with a light occupation, *i.e.*, the ability to lift up to twenty-five pounds. However, the evidence

shows that Lincoln did not obtain a job description or occupational analysis while processing Plaintiff's STD claim as such steps were unnecessary since her claim was approved due to depression rather than a physical limitation, and, therefore, the notation in her STD file is immaterial. After Plaintiff's claim transitioned to LTD and required an analysis of whether Plaintiff was totally disabled due to a condition other than her depression, Lincoln obtained two vocational analyses identifying her position as sedentary, and those determinations went unchallenged by Plaintiff during her first administrative appeal. In her second administrative appeal, Plaintiff challenged the classification, but only on the basis of the STD claim note. Her attempt to now challenge those vocational assessments by pointing to specific job duties in her job description that may or may not be consistent with a light occupation thus fails, as she did raise that argument during the administrative process. (*See* AR at 155-56 (Plaintiff's vocational argument during appeals process.) *See Morningred v. Delta Family-Care & Survivorship Plan*, 790 F. Supp. 2d 177, 192-93 (D. Del. 2011) (stating that, under ERISA's exhaustion requirement, a claimant must raise arguments during the administrative process rather than for the first time in litigation).

Assuming *arguendo* that this issue had been properly raised during the administrative process, the clear language of the LTD Policy supports Lincoln's determination that Plaintiff's Own Occupation as a customer service representative

was sedentary. Contrary to Plaintiff's argument that Lincoln acted improperly by relying not only on her employer's job description but also on the Department of Labor's description obtained from the Dictionary of Occupational Titles ("DOT") in classifying her Own Occupation, the LTD Policy specifically defines "Own Occupation" by reference to how a person's occupation is regularly performed in the national economy:

> OWN OCCUPATION . . . means the occupation, trade or profession . . . in which the Insured Employee was employed with the Employer prior to Disability . . . It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles.

(AR at 73.) The LTD Policy further states that the "Main Duties" of an occupation include:

> those job tasks . . . as described in the U.S. Department of Labor Dictionary of Occupational Titles; and . . . as performed in the general labor market and national economy . . . Main Duties are **not** limited to those specific job tasks as performed for a certain firm or at a certain work site.

(AR at 73 (emphasis in original).)

Accordingly, because Lincoln's LTD Policy explicitly defines "Own Occupation" by referring to how the occupation is performed in the national economy, it was appropriate for Lincoln to include in its consideration the DOT job description in addition to the description obtained from Delta Dental. Two vocational consultants properly gave consideration to the description of job duties

21

Lincoln obtained from Delta Dental as well as the DOT job description and concluded that the physical demands of Plaintiff's occupation were sedentary. The court therefore finds that Lincoln did not act in an arbitrary and capricious manner in characterizing the principal duties and responsibilities of Plaintiff's occupation.

### C. Lincoln's determination that Plaintiff is not independently totally disabled from a condition other than depression

Plaintiff further argues that, in denying her claim, Lincoln "ignored" relevant medical evidence showing that Plaintiff had debilitating issues with her lower back and knee prior to September 18, 2012. However, the medical records, summarized above, consistently indicate that Plaintiff's physical examinations were normal, that her spine had "very mild" degeneration, and that she was encouraged to remain active with exercise and stretching. Significantly, although Plaintiff treated with several medical providers, not a single physician—not even her primary care physician or her pain physician—supported her claim. Notwithstanding Plaintiff's attempt to explain away the absence of references to Plaintiff's leg and back pain in her primary care physician's medical records by arguing that he is "is not [her] pain doctor" (*see* Doc. 64, p. 12 of 30), it is apparent from those records that Dr. Rowehl routinely noted Plaintiff's subjective complaints of pain. Notably, Dr. Rowehl saw Plaintiff the day she stopped working, *i.e.*, September 17, 2012, yet there is no indication in the medical record that Plaintiff presented any complaints of leg or back pain. (*See* AR at 380-84.)

Indeed, the only support Plaintiff provides for her claim are disability forms completed by Ms. Tanner, a physician's assistant, in which she indicates that Plaintiff was disabled.[1] There is no indication, however, that Ms. Tanner was qualified to opine on functionality and her opinion in this regard is arguably undermined by the contemporaneous medical records in which she noted that Plaintiff's physical examinations were normal and that Plaintiff should remain active. As other courts have articulated, post-hoc disability certifications that are inconsistent with contemporaneous medical records do not constitute proof of disability. *See Young v. Am. Int'l Life Assur. Co. of N.Y.*, 357 F. App'x 464, 469 (3d Cir. 2009) (finding that treating doctor's statement that the plaintiff could not return to work was "seriously undermined" by doctor's own treatment records); *Bumpas v. Unum Life Ins. Co.*, Civ. No. 803-cv-2105, 2005 WL 2428537, *5 (M.D. Fl. Sept. 30, 2005) (finding that the administrator was correct "to rely on the contemporaneous treatment notes of Plaintiff's physicians, rather than [their] post hoc certification of disability."); *Price v. Disability RMS*, Civ. No. 06-10251, 2008 WL 763255, *18 (D. Mass. Mar. 21, 2008) ("While the record includes statements

---

[1] In another attempt to explain away the absence of physician support for her claim, Plaintiff states that "Dr. Lupinacci signed off on everything [Ms. Tanner] did and supported her findings." (Doc. 64 at p. 14 of 30 n.2.) However, while Dr. Lupanicci signed several of Ms. Tanner's office visit notes, he did not sign the work capacity forms that form the basis of Plaintiff's LTD claim nor did he independently provide any support for her claim. (*See* AR at 326-28, 1005, 1326, 1364.)

. . . offering opinions that Dr. Price was not able to work . . . , what is lacking is record support for those opinions.")

Furthermore, on November 19, 2012, Ms. Tanner indicated in a disability form for the Department of Public Welfare that Plaintiff's disability was temporary and *began on November 31, 2012*. (AR at 1364 (emphasis added).) Plaintiff's coverage under the LTD Policy, however, terminated as of September 18, 2012, unless she could show that she was Totally Disabled due to an independent condition as of that date. *See Sobh v. Hartford Life & Acc. Ins. Co.*, 2016 WL 3564380, *7 (11th Cir. July 1, 2016) (holding that claimant lost coverage when she stopped working but was not disabled and that proof of a later disability could not revive coverage). Although Dr. Tanner later indicated in an Attending Physician's Statement dated December 12, 2012 that Plaintiff became physically unable to work on September 17, 2012, the statement is unreliable as it is inconsistent with her prior statement and contradicted by the medical records.

Accordingly, the court finds that Lincoln did not act in an arbitrary and capricious manner in rejecting Ms. Tanner's opinion and finding that Plaintiff was not Totally Disabled from an independent physical condition as of September 18, 2012.

## D. SSA's determination that Plaintiff is disabled

Plaintiff also argues that, while not dispositive, the SSA's finding that Plaintiff is disabled is evidence that she is Totally Disabled under the LTD Policy. However, the LTD Policy excludes coverage for a disability resulting from a pre-existing condition, such as Plaintiff's depression, whereas the SSA does not. *See Thiel v. Life Ins. Co. of N. Am.*, 271 F. App'x 514, 518 (6th Cir. 2008) (stating that SSDI award was entitled to no weight because claimant's disability was excluded as pre-existing under the LTD policy but not under the SSA regime). Furthermore, although Plaintiff states that she provided Lincoln with her social security file, Lincoln disputes this assertion, claiming that Plaintiff provided Lincoln with an incomplete file and no basis to evaluate the basis of the SSA's determination. As Lincoln points out, while there appear to be various SSA documents dispersed throughout the administrative record, certain underlying documents are notably absent. For instance, although Plaintiff submitted a Medical Consultant's Review of Physical Residual Functional Capacity Assessment form, indicating agreement or disagreement with the opinion expressed in an underlying Physical Residual Functional Capacity Assessment, she failed to provide the underlying assessment. (*See* AR at 569.) Based upon the information that Plaintiff did provide, Lincoln concluded that the SSA's award of benefits was approved, at least in part, due to depression as well as Plaintiff's "advanced age." (*See* Doc. 56, p. 18 of 27 n.8.)

Thus, Lincoln did not abuse its discretion in reaching a different conclusion from the SSA regarding Plaintiff's request for LTD. *See McDonald v. Appleton Papers Inc. Ret. Plan*, Civ. No. 2014 WL 4660683 (W.D. Pa. Sept. 17, 2014) (concluding that "Defendants did not abuse their discretion in reaching a different conclusion from the [SSA]" when the plaintiff "did not provide the Plan with the entire record from the [SSA] proceedings").

## V.      Conclusion

The material facts in this case are not in dispute. Having reviewed the record as it existed at the time the decision to deny Plaintiff's disability benefits was made, the court finds that Lincoln's decision is proper under the arbitrary and capricious standard of review. As previously noted, so long as the administrator's determination is clearly supported by the evidence, the court is to affirm its decision. Here, Lincoln's decision to deny Plaintiff LTD benefits is supported by substantial evidence in the record, and without substituting the court's judgment for that of the defendant in determining eligibility for plan benefits, the court concludes that Plaintiff is not entitled to benefits under the terms of the LTD Policy and that Lincoln's decision was neither arbitrary nor capricious. Accordingly, Lincoln's motion for summary judgment is granted and Plaintiff's is denied.

An appropriate order will follow.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: June 19, 2017